```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY
```

| | |
|---|---|
| PNC BANK, N.A.,<br><br>    Plaintiff,<br><br>    v.<br><br>STAR GROUP COMMUNICATIONS,<br>INC., LINDA ROSANIO-TALAMO,<br>and JANNARO TALAMO,<br><br>    Defendants. | HONORABLE NOEL L. HILLMAN<br><br>CIVIL ACTION NO. 15-5108<br><br>**OPINION** |

**APPEARANCES:**

```
DUANE MORRIS LLP
By:  James J. Holman, Esq.
     Michael S. Zullo, Esq.
     Sommer L. Ross, Esq.
30 South 17th Street
Philadelphia, Pennsylvania 19103
          Counsel for Plaintiff

TARTER KRINSKY & DROGIN LLP
By:  Linda S. Roth, Esq.
     Richard C. Schoenstein, Esq.
     Jonathan Temchin, Esq.
475 Wall Street
Princeton, New Jersey 08540
          Counsel for Defendants Linda Rosanio-Talamo and
          Jannaro Talamo
```

**HILLMAN**, United States District Judge:

    The parties' disputes arise out of a series of commercial loan transactions between Plaintiff PNC Bank, and Defendant Star Group Communications, Inc. PNC Bank contends that Star Group defaulted on its obligations, and in its three-count breach of

1

contract complaint, seeks to collect over $8.7 million from Star Group as the Borrower (Count 1), or the individual Defendants, Linda Rosanio-Talamo (Count 2) and Jannaro Talamo (Count 3) (collectively, "the Talamos"), as the Guarantors of the debt at issue.[1]

The Talamos, in turn, assert eight different counterclaims against PNC Bank, all of which are rooted in the Talamos' theory that PNC,

> acting irrationally and capriciously, . . . seized control of the accounts, the personnel, and the operations of Star, and interfered with any and all attempts of Star and the Individual Defendants to obtain financing or to consummate transactions that would have recapitalized Star and paid off the Bank. Thereby, the Bank directly caused the demise of Star, resulting in the shutting down of its operations and subjecting it to involuntary bankruptcy proceedings. . . . As a result, the Individual Defendants lost their 30 year-old company, valued at no less than $30 million, plus another $3 million in personal savings that the Individual Defendants had invested to bridge the gap to closing with the private equity investor.

(Amended Answer ¶ 98, 100) The Amended Answer asserts that "the Bank should be held to account for the $30 million loss to the Individual Defendants and other damages, compensatory as well as punitive, as may be determined by this action." (Id. ¶ 155)

---

[1] The Court has diversity of citizenship subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The parties are completely diverse and the amount in controversy well exceeds the statutory minimum.

2

Presently before the Court is PNC Bank's Motion to Dismiss the Talamo's counterclaims pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons stated herein, the Motion will be granted in part and denied in part.

**I.**

Linda Rosanio-Talamo was Star's founder and CEO. (Amend. Answer ¶ 108) Jannaro Talamo was Star's Chief Creative Officer, and is Linda's husband. (Id. ¶ 109) As officers of Star, their relationship with PNC Bank began in 2007. (Id. ¶ 110) At that time, PNC Bank allegedly induced Star and the Talamos to move their credit from Bank of America to PNC Bank "predicated on [PNC] Bank's insistence that it could help grow their business." (Id. ¶ 110)

According to the Talamos, PNC Bank was "highly motivated" to loan money to Star and "consistently encouraged" Star to utilize the $10 million combined credit line that PNC Bank provided to Star "from the very outset of the relationship." (Amend. Answer ¶ 111, 113) Allegedly, PNC Bank "never suggested that the combined $10 million credit line was excessive or made any attempt to further limit overall exposure for the Bank." (Id. ¶ 113)

To the contrary, the Talamos allege that in 2010, PNC Bank "counseled against" "the possibility of an infusion of equity to reset [Star's] balance sheet," instead "convincing" the Talamos

"that they should . . . fuel Star's growth with 'inexpensive' bank debt," rather than equity. (Amend. Answer ¶ 115) In doing so, PNC Bank, allegedly, "was acting in its own interest, trying to prolong a financially beneficial relationship whether or not that arrangement was in the best interests of the Individual Defendants or their company." (Id. ¶ 116)

Allegedly, in connection with Star taking on more debt, PNC Bank "surreptitiously raised the amounts supposedly guaranteed by [the Talamos] from $2 million to the entire $10 million. Nobody at Star, including in-house counsel, caught the amended guarantees since they were never part of the discussions." (Amend. Answer ¶ 116)

Then, "the Great Recession" occurred and Star's financial situation changed. (Amend. Answer ¶ 117) Allegedly,

> [i]n 2013 and 2014, the Individual Defendants invested approximately $3 million of their own savings into Star. Under the circumstances, they had become intent upon securing additional capital and retiring any remaining debt with the Bank, which was due to mature in early 2015. The resetting of Star's balance sheet would have been beneficial to the company's long-term financial well-being and that of the Individual Defendants. Accordingly, and against the advice of the Bank, the Individual Defendants began preparing the company for a capital raise and made road show presentations to various private equity sources.

(Id.)

On November 24, 2014, Star allegedly signed a term sheet for a transaction with Peachtree Capital Corporation and Star

Mountain Capital ("SMC") with the intent that the proceeds of the transaction would be used "to retire the bank debt in full, pay down the company's accounts payable, and have a reserve to fuel growth." (Amend. Answer ¶ 118)

According to the Talamos, they told PNC Bank about the Peachtree/SMC transaction-- which was "originally projected to close . . . in the first quarter of 2015" (Amend. Answer ¶ 118)-- and their intent to use the transaction's proceeds "to pay the note that was due as of December 31, 2014, as well as the entire balance of their outstanding loans." (Id. ¶ 124)

"In the beginning of 2015," - i.e., after at least one of Star's notes had become due - PNC Bank's "attitude" allegedly "changed drastically." (Amend. Answer ¶ 127) PNC Bank allegedly "demanded that an outside consultant be hired to assess Star's ability to manage cash flow and assist in the closing with Peachtree/SMC." (Id.) Although Star hired a consultant who PNC Bank allegedly approved, the bank also separately engaged an additional consultant. (Id.) PNC Bank also moved Star from its "regular account team" to the bank's "workout group." (Amend. Answer ¶ 128)

By February, 2015, the parties' relationship allegedly deteriorated further. (Amend. Answer ¶ 129) The Talamos allege that in several different ways, PNC Bank was "actively interfering with the day-to-day management of Star" which

directly caused "the delay in the closing" of the Peachtree/SMC transaction. (Id.)

As the situation worsened, PNC Bank allegedly compounded Star's problems. "When Star sought assistance from the Credit Policy Department with respect to temporary cash flow pressures it faced to meet payroll and payables, the Credit Policy Department" allegedly "turned a deaf ear." (Amend. Answer ¶ 133) The Talamos allege that, "[r]ather than provide assistance, the Bank simply piled on additional cash flow demands when Star could least afford them." (Id.)

In May 2015, the Talamos assert that they "realized their only path to closing the Peachtree/SMC deal was buy the Bank out." (Amend. Answer ¶ 136) Accordingly, the parties allegedly anticipated that Allied Financial Group would buy Star's debt from PNC Bank at "a steep discount." (Id. ¶ 136)[2]

However, the Talamos allege that PNC Bank "torpedoed" this transaction as well, by "put[ting] Allied through an onerous and contentious process to close, which led Allied to unreasonably doubt the sufficiency of the accounts receivable that would fund the loan." (Amend. Answer ¶ 142)

On the afternoon of June 23, 2015, "Allied pulled out of the transaction entirely." (Amend. Answer ¶ 144) The next day,

---

[2] Also in May 2015, PNC Bank sent Star a formal letter declaring default. (Amend. Answer ¶ 153 and Compl. Ex O)

PNC Bank allegedly "sent dozens of letters to Star's clients asserting the Bank's purported rights to client receivables." (Id. ¶ 145)

On July 1, 2015, "Star announced it had to cease operations." (Amend. Answer ¶ 147) On August 17, 2015, "three of Star's creditors commenced an involuntary bankruptcy proceeding under Chapter 7." (Id. ¶ 151)

## II.

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff. *Evancho v. Fisher*, 423 F.3d 347, 351 (3d Cir. 2005). It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

Under the liberal federal pleading rules, it is not necessary to plead evidence, and it is not necessary to plead all the facts that serve as a basis for the claim. *Bogosian v. Gulf Oil Corp.*, 562 F.2d 434, 446 (3d Cir. 1977). However, "the Federal Rules of Civil Procedure . . . do require that the pleadings give defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Baldwin Cnty.*

*Welcome Ctr. v. Brown*, 466 U.S. 147, 149-50 n.3 (1984) (quotation and citation omitted).

A district court, in weighing a motion to dismiss, asks "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.'" *Bell Atlantic v. Twombly*, 550 U.S. 544, 563 n.8 (2007) (quoting *Scheuer v. Rhoades*, 416 U.S. 232, 236 (1974)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009)("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)("*Iqbal* . . . provides the final nail in the coffin for the 'no set of facts' standard that applied to federal complaints before *Twombly*.").

### III.

The counterclaims asserted are: (1) rescission of the Talamos' individual guarantees; (2) common law fraud; (3) violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1 et seq.; (4) negligent misrepresentation; (5) breach of fiduciary duty; (6) breach of the duty of good faith and fair dealing; (7) tortious interference with the transactions with Peachtree/SMC and Allied; and (8) negligence.

In support of its Motion to Dismiss, PNC Bank asserts that the Talamos lack standing to assert any of the counterclaims. It also individually attacks each counterclaim.

**A.**

PNC Bank asserts that the Talamos seek recovery for harm to Star, rather than themselves as guarantors. Therefore, under the derivative injury rule, they lack standing to assert all of the counterclaims. The Talamos' response is two-fold: (1) not all of their claims are predicated on harm to Star; and (2) an exception to the derivative injury rule applies.

The basic rule of law is not in dispute: shareholders and officers do not have standing to assert claims alleging wrongs to their corporation. *Cent. Jersey Freightliner, Inc. v. Freightliner Corp.*, 987 F. Supp. 289, 301 (D.N.J. 1997); *Pepe v. General Motors Acceptance Corp.*, 254 N.J. Super. 662, 666 (App. Div. 1992). The parties do dispute, however, whether the Talamos seek to recover for alleged wrongs to Star, as opposed to themselves. In this regard, the Amended Answer asserts the following injuries:

- Count 1 – Rescission; the guarantees that the Talamos executed were not supported by consideration and were procured by fraud and/or economic duress

- Count 2 – Fraud; intentional misrepresentation, specifically:

    (a) failing to disclose to the Individual Defendants that the Bank believed the line of credit [extended to Star] was excessive;

    (b) failing to advise the Individual Defendants that they should not utilize the full extent of the line of credit extended by the Bank [to Star];

9

(c) representing that the Individual Defendants should avoid raising capital [for Star] through equity grants, and [Star] would be better off continuing bank debt that the Bank believed was excessive in amount;

(d) inducing Individual Defendants to enter into guarantees (for amounts which it surreptitiously raised) and releases that were solely to the benefit of the Bank;

(e) representing that the Bank would support a [Star] transaction with Peachtree/SMC when, in fact, the Bank had no intention of consummating such a transaction; and

(f) representing that the Bank would take a reduced payoff and support a [Star] transaction with Allied when, in fact, the Bank had no intention of consummating such a transaction.

- Count 3 – New Jersey Consumer Fraud Act based on the same alleged misrepresentations as the common law fraud claim

- Count 4 – Negligent misrepresentation based on the same alleged misrepresentations as the common law fraud claim

- Count 5 – breach of fiduciary duty based on the same alleged misrepresentations as the common law fraud claim and additionally

(g) interfering with the operations of the Individual Defendants and their business;

(h) failing to honor checks and otherwise interfering with the reputation of the Individual Defendants in the business community that they served;

(i) interfering with [Star's] transaction with Peachtree/SMC; and

(j) interfering with [Star's] transaction with Allied.

- Count 6 – Breach of Good Faith and Fair Dealing based on the same alleged breaches as the breach of fiduciary duty claim

- Count 7 – Tortious interference with contract and/or business opportunity: "[t]he Bank interfered with [Star's] transactions with Peachtree/SMC and Allied."

- Count 8 – Negligence based on the same alleged wrongs as the breach of fiduciary duty claim

Some of these alleged injuries are injuries to Star and not the Talamos. Most clearly, the tortious interference count alleges that PNC Bank interfered with contemplated contracts and business opportunities that were Star's, not the Talamos'. Thus, Count 7 is barred by the derivative injury rule.

Likewise, to the extent Counts 5, 6 and 8 are predicated on the same alleged interferences-- see (i) and (j)-- such claims are also barred.

On the other hand, claims based on allegations that PNC Bank fraudulently induced the Talamos themselves to sign personal guarantees-- Counts 1, 2(d), 3(d), and 4(d) -- are clearly not barred by the derivative injury rule.

The remainder of the alleged injuries in Counts 2, 3 and 4, as well as Counts 5, 6 and 8 to the extent they assert identical injuries-- i.e., (a) through (c) and (e) through (f) of each Count-- are injuries to Star. The alleged misrepresentations

11

were about Star's line of credit and Star's transactions which allegedly caused the Talamos, acting in their capacity as Star's officers, to take, or not take, certain actions on behalf of Star.

Lastly, the Amended Answer's allegations that PNC Bank interfered with (g) "the operations of the Individual Defendants," independent from interference with Star, and (h) "the reputation of the Individual Defendants in the business community that they served," are, at this early stage of the case, sufficiently particular to the Talamos, as distinct from Star, to survive the instant motion to dismiss.

Further, no exception to the derivative injury rule saves the barred claims. While the Talamos are correct that courts within this District have held, as a matter of New Jersey law, that an "exception" to the standing rule applies when both guarantor and surety are joined as defendants, the courts have only done so in cases where the guarantor asserts a counterclaim for breach of contract and breach of the duty of good faith and fair dealing implied in the contract. *See Wingate Inns Int'l, Inc. v. Cypress Centre Hotels, LLC,* 2012 WL 6625753 (D.N.J. 2012); *Coldwell Banker Real Estate, LLC v. Plummer & Assoc., Inc.*, 2009 WL 3230840 (D.N.J. 2009); *Travelodge Hotels, Inc. v. Elkins Motel Assoc., Inc.*, 2005 WL 2656676 (D.N.J. 2005).

Extending those cases' "exception" to all of the claims the Talamos assert in this case-- none of which are breach of contract and most of which largely sound in tort and, indeed, fraud-- would effectively swallow the rule.[3]

Additionally, Counts 3 and 5 fail for independent reasons as set forth next.

**B.**

Count 3, the Consumer Fraud Act claim, to the extent that it is predicated on the commercial transactions of Star, fails as a matter of law. The Talamos argue that "the sale of consumer credit is generally considered merchandise and therefore covered by the CFA." (Opposition Brief, p. 31-32) Assuming consumer credit is merchandise[4], the problem with this argument is that the alleged transactions did not involve consumer credit extended to a consumer, but rather millions of dollars of commercial credit extended to a business.

As the undersigned has stated before, "'the entire thrust of the Consumer Fraud Act is pointed to products and services

---

[3] In light of this Court's ruling that no exception to the derivative injury rule applies, the Court need not reach PNC Bank's argument that Star's claims were released in bankruptcy, and the Talamos' counterargument that the release was procured by fraud.

[4] The CFA applies to unconscionable commercial practices made "in connection with the sale or advertisement of any merchandise." N.J.S.A. § 56:8-2.

sold to consumers in the popular sense.'" *CIBC Inc. v. Grande Vill. LLC*, 2015 WL 5723135, at *3 (D.N.J. Sept. 29, 2015) (quoting *J & R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259, 1272 (3d Cir. 1994)); *see also DepoLink Court Reporting & Litig. Support Servs. v. Rochman*, 430 N.J. Super. 325, 338 (App. Div. 2013)("The legislative intent in enacting the CFA was to curtail the sharp practices and dealings in the marketing of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through fraudulent, deceptive or other similar kind of selling or advertising practices. The Act focuses on compelling those who sell consumer goods and services to the public to develop practices that will minimize consumer fraud.")(internal citations and quotations omitted). In this case, as in *CIBC*, "the commercial transactions fall outside the purview of the CFA." 2015 WL 5723135, at *4.

To the extent that Count 3 is based on the allegation that PNC Bank fraudulently induced the Talamos to guarantee Star's debts, that transaction, too, is not a consumer transaction. Contrary to the Talamos' argument, the lone fact that the guarantees were executed by the Talamos in their personal capacities does not transform the transaction into a consumer transaction.

The Motion to Dismiss Count 3 will be granted.

## C.

Count 5, the breach of fiduciary duty claim, fails as a matter of law because PNC Bank owed no fiduciary duty to either Star or the Talamos. The factual allegations are clear concerning the nature of the parties' commercial relationship, and it is not the type of relationship giving rise to fiduciary duties.

"The virtually unanimous rule is that creditor-debtor relationships rarely give rise to a fiduciary duty. As aptly noted by the Court of Appeals for the Third Circuit, it would be anomalous to require a lender to act as a fiduciary for interests on the opposite side of the negotiating table because their respective positions are essentially adversarial." *United Jersey Bank v. Kensey*, 306 N.J. Super. 540, 552 (App. Div. 1997)(internal citations and quotations omitted).

The Talamos' allegations that PNC Bank held itself out to be Star's and the Talamos' "partner" in helping to grow Star's business, and that the parties' commercial relationship lasted eight years, are insufficient to overcome the "general presumption that the relationship between lenders and borrowers is conducted at arms-length, and the parties are each acting in their own interest." *Kensey*, 306 N.J. Super. at 553.

The Motion to Dismiss Count 5 will be granted.

## D.

The remaining Counts, to the extent that they are not predicated on alleged injuries to Star, will not be dismissed.

With regard to Count 1, rescission of the guarantees, PNC Bank asserts that the claim should be dismissed because the guarantees were supported by adequate consideration. Even assuming *arguendo* that PNC Bank is correct, the Talamos assert fraud as an independent basis for rescission, and as set forth next, contrary to PNC Bank's argument, the fraud allegations survive the instant motion to dismiss.

PNC Bank argues that the allegations of fraud are insufficient under Fed. R. Civ. P. 9(b), which requires that "a party must state with particularity the circumstances constituting fraud." (Reply Brief. p. 6-7) The Court disagrees. The Talamos have separately identified six alleged misrepresentations or omissions that they assert support their fraud claims (see Count 2(a)-(f)), and they have sufficiently pled facts placing those alleged misrepresentations and omissions in context. This is sufficient insofar as the allegations contain "enough particularity to place defendants on notice of the precise misconduct with which they are charged." *United States ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017).

Specifically with regard to the alleged misrepresentations in connection with the Talamos' guarantees, the Amended Answer

alleges that PNC Bank "surreptitiously raised the amounts supposedly guaranteed by [the Talamos] from $2 million to the entire $10 million. Nobody at Star, including in-house counsel, caught the amended guarantees since they were never part of the discussions." (Amend. Answer ¶ 116)

As to the breach of duty of good faith and fair dealing count, to the extent it is independent from the dismissed breach of fiduciary duty count, the Talamos have sufficiently stated a claim at this early stage of the case. "A covenant of good faith and fair dealing is implied in every contract in New Jersey." *Wilson v. Amerada Hess Corp.*, 168 N.J. 236, 244 (2001). According to the Amended Answer, ¶ 116, "the Bank was acting in its own self-interest . . . when it came time to exercise the credit line for a bridge Loan . . . the Bank surreptitiously raised the amounts supposedly guaranteed by the Individual Defendants from $2 million to the entire $10 million." Thus, the Talamos allege that PNC Bank acted in bad faith when it "surreptitiously" changed the terms of the parties' contract. *See Wilson,* 168 N.J. at 245 ("good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness.").

Lastly, as to the negligence claims, Counts 4 and 8, PNC Bank argues that: (1) it owes no duty to the Talamos and (2) the economic loss doctrine bars the claims. Both arguments fail.

Every person has a duty to act with reasonable care under the circumstances. *See generally Weinberg v. Dinger,* 106 N.J. 469, 484 (1987)("The standard of care ordinarily imposed by negligence law is well established. To act non-negligently is to take reasonable precautions to prevent the occurrence of foreseeable harm to others. What precautions are 'reasonable' depends upon the risk of harm involved and the practicability of preventing it."); *Lockhart v. Willingboro High Sch.*, 170 F. Supp. 3d 722, 737 (D.N.J. 2015) ("'[F]oreseeable risk is the indispensable cornerstone of any formulation of a duty of care.'")(quoting *Dunphy v. Gregor*, 136 N.J. 99 (1994)). While the Court holds that PNC Bank has no heightened duty of care because no fiduciary relationship existed, it does not follow that PNC Bank may therefore act with less care than it would in the ordinary course of dealings with borrowers and guarantors.

The economic loss doctrine maintains the "critical" "distinctions between tort and contract actions." *Saltiel v. GSI Consultants*, 170 N.J. 297, 310 (2002). "Essentially, the economic loss doctrine functions to eliminate recovery on 'a contract claim in tort claim clothing.'" *G&F Graphic Servs. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583, 588-89 (D.N.J.

2014)(quoting *SRC Constr. Corp. v. Atl. City Hous. Auth.*, 935 F. Supp. 2d 796, 801 (D.N.J. 2013)).

If, through a tort claim, a plaintiff "simply seeks to enhance the benefit of the bargain [he] contracted for," *Saltiel,* 170 N.J. at 315, the economic loss doctrine applies. If, however, a plaintiff asserts that a defendant breached a "duty owed to the plaintiff that is independent of the duties that arose under the contract," *id*. at 317, the economic loss doctrine does not apply.

Among other things, the Talamos allege that PNC Bank breached its duty of reasonable care when it took actions that resulted in the disruption of operations of the Talamos' business and harm to the Talamos' business reputation in the community. Such breach of duty is independent from any duty-- express or implied-- imposed by the guarantees or any contract to which Star was a party. Thus, the economic loss doctrine does not apply.

**IV.**

For the above-stated reasons, PNC Bank's Motion to Dismiss the Talamos' counterclaims will be granted in part and denied in part. The Motion will be granted as to Counts 3, 5, and 7 in their entirety; as well as Count 2(a)-(c) and (e)-(f); Count 4(a)-(c) and (e)-(f); Count 6(a)-(c), (e)-(f), and (i)-(j); and Count 8(a)-(c), (e)-(f), and (i)-(j). The Motion will be denied

19

as to Count 1 in its entirety; as well as Count 2(d); Count 4(d); Count 6(d) and (g)-(h); and Count 8(d) and (g)-(h).  An appropriate Order accompanies this Opinion.


Dated: August 24, 2017
At Camden, New Jersey                    __s/ Noel L. Hillman___
                                         **Noel L. Hillman, U.S.D.J.**